UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:

Candis Koch,                                    Case No.: 15-42834
                                                Chapter 7
        Debtor.                                 Hon. Mark A. Randon

_____/

Daniel M. McDermott,

        Plaintiff,

v.                                              Adversary Proceeding
                                                Case No.: 15-04644

Candis Koch,

        Defendant.

_____/

## OPINION AND ORDER GRANTING THE UNITED STATES TRUSTEE'S OBJECTION TO DEFENDANT'S CHAPTER 7 DISCHARGE

## I.    INTRODUCTION

        Candis Koch was a restaurateur and real estate investor.  As a business owner, she

successfully navigated several complex financial and real estate transactions.  But when

mounting debt necessitated an individual Chapter 7 bankruptcy, Koch failed to list all of

her assets; substantially under reported her liabilities; listed "$0.00" in income and

expenses; and omitted several pre-petition property transfers to her daughter.  Three

weeks later, during her 341 Meeting of Creditors, Koch testified that she had listed *all* of

her assets and liabilities–when she still had not–and said that her schedules did not need to be amended–when, quite obviously, they did.

For ten months, the original filings stood, essentially unchanged. It was not until after the United States Trustee ("UST") and a creditor challenged her right to a discharge–and the Court ordered her appearance at a Rule 2004 examination–that Koch obtained new counsel; amended her schedules to accurately reveal the state of her financial affairs and property transfers; and turned over approximately $9,000.00 to the Chapter 7 Trustee. As for the original omissions and false statements, Koch blames: (1) the ineptitude of her first bankruptcy attorney; (2) her belief that her daughter "technically owned" property titled in Koch's name; and (3) imprecise questioning by the Chapter 7 Trustee. The Court conducted a two-day trial.

Because the Court finds that Koch's testimony was not credible, and her proffered justifications belied by her record as a sophisticated businesswoman, the Court **DENIES** Koch a Chapter 7 discharge under sections 727(a)(2)(A) and 727(a)(4)(A) of the bankruptcy code.

## II. JURISDICTION

The Court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).[1]

---

[1]"The parties do not contest the jurisdiction of the Court to hear and determine this matter and to enter appropriate final orders and judgments in this case." Joint Final Pretrial Order (Dkt. No. 49 at p. 2).

## III.    FINDINGS OF FACT

### A.    *Koch's Businesses*

Koch owned several companies, including: The T.A.C. Group, Inc.; Tin Fish II, LLC; Tin Fish III, LLC; Tin Fish of Novi, LLC; and Brandon Investments, Inc.  She had been in the restaurant business for at least 15 years and a licensed real estate broker for at least 35 years.  Through Brandon Investments and her friend's company, Dawn Investments, Koch flipped dozens of houses and at least one commercial building.

In 2002, Koch purchased her first Tin Fish restaurant in Fair Haven.  That restaurant operated until 2011.  She borrowed approximately $1.2 million from Fifth Third Bank to pay off the Fair Haven property and finance the acquisition of furniture, fixtures, and equipment for a second Tin Fish restaurant at the Partridge Creek Mall in 2008.  That restaurant operated until 2014.  In 2010, while both the Fair Haven and Partridge Creek restaurants were still in operation, Koch opened a third Tin Fish restaurant at the Twelve Oaks Mall.  That restaurant operated until 2013.

Koch did not always use conventional financing: she had individual investors including her brother, Robert Beller; her brother-in-law, Mark Dermanulian; and her friend, Father Paul Chateau.

Koch's daughter, Allison, "owned" two related companies: (1) Tin Fish Management, LLC; and (2) C-Squared, LLC.  Tin Fish Management operated a Tin Fish

restaurant at Jefferson Beach Marina from 2013 until 2015.[2] Allison, however, testified

at her deposition that she did not know anything about C-Squared.[3] According to Allison,

the only business she had an interest in was Tin Fin Management:

> Q.   Do you have any interest in any business?
>
> A.   Right now?  No.
>
> Q.   Okay.  Have you, since you graduated from high school?
>
> A.   Have I owned any businesses since I graduated from high school?
>
> Q.   Yes.
>
> A.   Yes.  Tin Fish Management.
>
> Q.   Any others?
>
> A.   No.
>
> Q.   Have you had an interest in any companies, businesses, entities, you know, whatever you want to call them, since you graduated from high school?
>
> A.   No.
>
> Q.   As far as you know, have you been a member of any LLCs, since you graduated from high school?
>
> A.   No, just Tin Fish Management.

*   *   *

---

[2] Koch was experiencing financial difficulties when Allison's company, Tin Fish Management, opened the Jefferson Beach restaurant.

[3] Koch testified that when Allison's deposition was taken, there was a rift between them; Allison testified at her deposition that she talks to her mom "every day."

Q. Was C-Squared an entity owned or operated by your mom?

* * *

A. I'm not sure. I think so.

(Dep. at pp. 26-27, 133).

### B. Koch's Financial Dealings with Allison

In December 2010, Koch deeded a condominium in Naples, Florida to Allison for no consideration. Allison later sold the condo for $500,000.00; her approximate net profit was $300,000.00. She used $82,000.00 of the proceeds to purchase a house on Jefferson Avenue where Koch currently resides, rent free. It is unclear how much, if any, of the proceeds went into Allison's bank account.

Koch started regularly accessing Allison's bank account in 2014. Allison testified at her deposition that: (1) "[her] mom can write whatever checks she wants out of [her] checkbook"; (2) "[her] mom can do whatever she wants with [her] bank account"; (3) "[she] trust[s] her [mom] a hundred percent. She [her mom] can do whatever she wants with [her] bank account." (Dep. at pp. 35, 40). Indeed, the following exchange occurred during Allison's deposition:

Q: So would your mom write a check out and then you would just sign it, out of your account?

A. She can, sure.

* * *

Q. Did she ever write out checks . . . from your account and just put them in front of you and ask you to sign them?

A.      Nothing without my knowledge or consent.

Q.      So if she wrote this check out and you signed it, what did she tell you it was for?

A.      I don't ask.  I trust whatever she wants to do with my account.

*     *     *

A.      My mom can do whatever she wants with my account, that's fine.

(Dep. at pp. 48, 56-57).  The evidence shows Koch freely wrote checks to various

companies to and from Allison's account–with no apparent benefit to Allison:

1.      Brandon Investments to Allison;[4]

2.      Allison to Brandon Investments;[5]

3.      Allison to Dawn Investments;[6]

4.      Dawn Investments to Allison;[7]

5.      Allison to C-Squared;[8]

6.      C-Squared to Allison;[9]

---

[4]These checks totaled at least $25,000.00.

[5]These checks totaled at least $80,000.00.

[6]One of these checks was in the amount of $1,500.00.

[7]One of these checks was in the amount of $107,169.58.

[8]These checks totaled at least $562,405.00.

[9]One of these checks was in the amount of $26,279.32.  At trial, Koch recalled that C-Squared loaned Allison money to purchase houses that she had to repay.

-6-

7. C-Squared to Tin Fish Management;[10]

8. The T.A.C. Group to Allison;[11] and

9. Tin Fish III to Tin Fish Management.[12]

Whether Allison actually signed these checks is unclear: Allison had a signature stamp, which Koch testified at her deposition she "sometimes" used.[13] More importantly, Allison testified at her deposition that she did not recognize any of the checks and did not recall receiving any money from the various companies.[14] During her deposition, Koch could not recall some of the transactions:

Q. Did Brandon Investments have any relationship to your daughter?

A. No.

* * *

Q. Did Brandon owe Allison any money?

A. Allison Group?

Q. No, Allison your daughter, Allison Koch. Sorry about that.

---

[10]One of these checks was in the amount of $10,000.00.

[11]One of these checks was in the amount of $51,000.00.

[12]One of these checks was in the amount of $10,000.00.

[13]Koch testified at trial that it was "very rare" for her to use Allison's stamp; she wrote out the checks and Allison signed them. The Court does not find Koch's testimony credible on this issue.

[14]Koch also endorsed several checks written to "Cash" from Allison's account and the account of C-Squared.

-7-

A.      No.[15]

Q.      And same with Dawn Investments, did Dawn Investments have any
        sort of relationship with your daughter?

A.      No.

Q.      Would they have owed her any money?

A.      No.[16]

                              *    *    *

Q.      And do you know why Brandon Investments would have been
        paying Allison?

A.      I do not.  I'd have to look at the scope of everything.

Q.      Did Brandon ever owe Allison any money?

A.      I don't think so.

                              *    *    *

Q.      Do you know why Allison would have been paying Dawn
        Investments money?

A.      No, I don't, not unless I saw the whole context of what was going
        on.

Q.      Do you know just in general, though, would there be a reason for
        Allison to pay Dawn Investments?

---

[15]At trial, Koch recalled that Brandon Investments paid Allison because she did
work for that company.  She also testified that Brandon Investments loaned Allison
money to purchase houses that she had to repay.

[16]At trial, Koch recalled that Dawn Investments loaned Allison money to purchase
houses that she had to repay.

A.     Like I say, I don't know for sure[.]

                              *     *     *

Q.     Let's go to the bottom one, for example, Dawn Investments to
       Allison for $107,000.00, Check 8492.  Why would Dawn being[sic]
       paying Allison that amount of money?

A.     It's very possible – I see in the memo it's a property on Oakridge.
       Without looking at everything, I would assume that it's a repayment
       for the cost of buying that house, I'm assuming.[17]

                              *     *     *

Q.     Do you know why TAC was paying Allison $51,000.00?

A.     I do not.

Q.     Do you know if TAC Group – why it would have owed Allison any
       money?

A.     I don't think she loaned them any money.[18]

Q.     Do you know what happened to this $51,000.00?

A.     No, I don't.

                              *     *     *

Q.     As far as it pertains to the Tin Fish III checks to Tin Fish
       Management, do you know why Tin Fish III was making these large
       sums of payment to Tin Fish Management?

---

[17]Allison was not familiar with the Oakridge property.

[18]Although Allison was not a creditor of The T.A.C. Group, it gave Allison this
money during the time it owed legitimate debts such as taxes on the Fair Haven Tin Fish
property.

-9-

A.     I don't.[19]

(Dep. at pp. 44-45, 56, 67-68, 79, 191).

According to Allison, Tin Fish Management also paid Koch's loans from Mr.

Beller:

Q.     Do you know why your company, Tin Fish Management, was paying
       Mr. Beller?

A.     A repayment of a loan that he loaned to her [Koch], I believe.

Q.     Well, what about – this check here is Tin Fish Management to
       Robert Beller.

A.     Right.

Q.     Did Mr. Beller loan Tin Fish Management money?

A.     No.

Q.     So do you know why Tin Fish Management was paying Mr. Beller?

A.     I was paying it for my mom.

Q.     You were paying Mr. Beller for your mom?

A.     Right.[20]

---

[19]At trial, Koch recalled that Tin Fish III loaned money to Tin Fish Management.

[20]One of these checks was in the amount of $2,833.33.  At trial, Koch originally testified that she did not know why Tin Fish Management paid Mr. Beller; she later indicated that he was an investor for Tin Fish Management.

(Dep. at pp. 127-128).  In addition, Mr. Beller was paid from a joint bank account held by Koch and Allison as well as from C-Squared's account.[21]  Koch also paid Father Paul at least $32,500.00 from the joint bank account.[22]

According to Koch, she no longer uses Allison's account.

### C.    Pre-Petition Transfers from Koch to Allison

Koch was the title holder of a 2002 Bombardier personal water craft.  On February 10, 2015–two weeks before filing bankruptcy–she transferred title to Allison.

Koch also transferred title to two vehicles to Allison within the year preceding her bankruptcy: a 2007 Saturn Sky was transferred on March 24, 2014; and a 2009 Jeep Grand Cherokee was transferred on February 10, 2015–again just two weeks before the bankruptcy.

### D.    Pre-Petition Meeting with Koch's First Bankruptcy Attorney

Koch's first bankruptcy attorney was Martin Krall.  He testified at his deposition that he met with Koch approximately two or three days before the bankruptcy filing and reviewed the petition and schedules with her:

> Q.    What happened on[sic] the meeting on February 24th?  What exactly did you and Ms. Koch do?

---

[21]One of the checks from C-Squared's account was for $100,000.00.  Allison did not recall signing that check and did not recall why it was written.

[22]At trial, Koch testified that C-Squared had a general ledger showing its financial transactions, but other than that, neither she nor Allison kept track of which entities loaned money and who was repaid.

-11-

A.	We went over the petition and schedules and it basically was I was completing the schedules with her.

Q.	You say that you were completing the schedules, were you asking her the questions in the schedules?

A.	Correct, yes.

\*	\*	\*

Q.	So just so I have the timeframe right you prepared the schedules with Ms. Koch on February 24th when she signed the documents, and the emergency petition was filed two day[s] later, correct?  Verbal?

A.	Yes. Oh, I'm sorry.

\*	\*	\*

Q.	When you prepare Statement of Financial Affairs for clients do you ask them each individual question?

A.	Generally, yes, you know, getting towards of[sic] end of the form when you ask about environmental property if I know their situation I don't ask them that.

\*	\*	\*

Q.	Let me ask you about question number ten, can you tell me how would you have explained question number ten to Ms. Koch?  Do you recall how you explained question number ten to Ms. Koch?

A.	No, I don't recall specifically.  Generally speaking I ask people simply did they transfer any property in the last two years, that includes, you know, typically most of these clients may have sold a car or something, you know, and I reference selling a car or anything else like that.

(Dep. at pp. 13-14, 53-54).  He also discussed an Initial Client Questionnaire with Koch:

Q.	After you got a questionnaire, an initial client questionnaire like this back, did you then go through each of the questions with the client?

-12-

A.     Yes, but in Miss Koch's case it was in connection with the whole petition and schedules, too, because it was a rush filing.

Q.     Okay.  So let me just ask you specifically about Ms. Koch's case[.] [Y]ou believe that she probably came in with this initial client questionnaire filled out.  Tell me what happened next?

A.     Honestly, I don't recall.  I think that, again, the best I can recall is that she came in on the February 24th date and brought this material with her.

Q.     Okay.

A.     I mean, but, again, that's just my recollection because *I know I would have reviewed this with her.*  So I'm just assuming that she brought it in on the 24th.  She could have brought it in before that.

(Dep. at pp. 31-32) (emphasis added).  Attorney Krall also informed Koch of the

importance of including all of her debts in the bankruptcy filing:

Q.     Now, if Ms. Koch had told you that she owed Paul Chateau 300 and some thousand dollars, would you have included that in the schedules?

A.     Absolutely.

*       *       *

Q.     Did you have occasion to discuss with her the importance of disclosing all her debts?

A.     With every client all debts and all assets, whether you want to file bankruptcy on them or not because it's a common misconception in my clientele.

Q.     What is that misconception?

A.     That if they do not want to declare, that they're not going to pay a particular creditor they don't have to list it on the schedule.  In other words, if they are planning to pay a creditor such as their house or

-13-

their car, they feel they don't have to list it and it's something that we have to clarify with all of them, all clients. They have to tell us everybody.

Q.   As you sit here today you're absolutely certain that you told her that, you told Ms. Koch that?

A.   Do I recall telling her that specifically, no. But it's like, do you recall saying "amen" after the sermon? I mean, it's something you do, it's something I do with all clients.

Q.   How long have you been practicing bankruptcy law?

A.   To some degree for 30 years.

Q.   Do you have kind of a speil that you give to every person that comes in?

A.   Yes, that's part of the speil.

Q.   And that's part of the speil?

A.   Correct.

(Dep. at pp. 98-99). At some point, Attorney Krall discussed the importance of disclosing all relevant pre-petition transfers of property:

Q.   Do you recall as you sit here today having discussed the importance of disclosing transfers within a year prior to bankruptcy or any transfers that are required on the Statement of Financial Affairs?

A.   Well, you know, not prior to the case being filed. I'm sure I would have because I went over it with her but it was after I learned of the transfers that we had some very extensive discussions and that was after the case was filed, probably after the deposition in May.

Q.   Specifically, the transfer of the jet ski or personal water craft to her daughter?

-14-

A.      Yeah, we talked about that.[23]

(Dep. at pp. 105-106).  Exhibit 7 to Attorney Krall's deposition is a document called Dos

and Don'ts that Attorney Krall provided to his clients.  It contains the following

instruction:

> **Do not transfer property** you own into someone else's name to avoid it being taken by creditors or the trustee.  That kind of transfer is a fraud on creditors and can result in your discharge being denied.  In addition, the trustee can take the property from the person to whom it was transferred.
>
> \*      \*      \*
>
> **Don't Sell or Transfer or give away any Assets you have without contacting me first.**  The filing of your Chapter 7 Bankruptcy petition creates a Bankruptcy Estate which temporarily comes under the control of the Trustee who is assigned to your particular case.  The Trustee's job is to Liquidate (sell and reduce to cash) any property that is not exempt under State or Federal Law.  Typically, few Chapter 7's that I file have any assets that are liquidated, and usually if there are likely to be assets in a case, I will have informed you of any potential Trustee liquidation before filing.  Nevertheless, DO NOT sell, give away, transfer title, settle any personal injury lawsuits or otherwise dispose of any of your property while your Chapter 7 Bankruptcy is pending.

(Emphasis in original).

Although he reviewed the documents with Koch, Attorney Krall did not recall her

actually signing the schedules or Statement of Financial Affairs ("SOFA"):

A.            [T]here's another printed version of the petition and schedules that were filed.

Q.            Are there any actual wet signatures on that document?

---

[23]Koch says she did not recall these discussions but the Court finds they did occur.

A.          No.

MS. BERG:   Now, earlier I asked you if you had wet signatures and you
            showed me signatures in ink [that] appeared to be original
            signatures.  What were those to, which set of these
            documents?

                              *     *     *

Q.          Mr. Krall, I remember seeing those that you emailed me, but
            those look like drafts basically, I mean, there's handwriting
            on those?

A.          Right, this is when we sat down on the 24th.

                              *     *     *

Q.          So not to cut to the chase, but are there any final printed
            versions of the schedules with wet signatures, schedules,
            Statement of Financial Affairs?

A.          You know, the only thing that I've been able to find is [the]
            petition with the wet signature.

                              *     *     *

Q.          How about schedules?

A.          Well, they weren't printed at that time, they're handwritten.

Q.          How about Statement of Financial Affairs?

A.          Same thing.

Q.          So did she [Koch] ever have an opportunity to review a final
            version of the documents before they were filed?

A.          Not that I recall.

Q.          Did she [Koch] ever sign a copy of the final [s]chedules or
            Statement of Financial Affairs before they were filed?

-16-

A.        Not that I recall.

                    *      *      *

Q.        I don't see any signature page in this group of documents that
          were attached to your email, the signature page for the
          schedule which is actually just a Schedule B, I don't see any
          of the other schedules with this?  Point of fact, I didn't see a
          signature page for the schedules, an actual signed signature
          page for the schedules anywhere in the documents that you
          sent yesterday?

A.        And I can't find it here.

                    *      *      *

Q.        Do you typically send clients a final version of the [s]chedules
          and Statement of Financial Affairs after they've been filed
          with the court?

A.        You know, typically I give it to them when they sign.

Q.        Okay.  But that didn't happen here?

A.        No, it did not.

(Dep. at pp. 25-27, 34, 84).  There is a dispute regarding whether Attorney Krall

discussed Schedule B with Koch: he testified that he did; Koch did not recall such a

discussion.[24]  Koch did not sign Schedule B.  However, she did sign a draft of a SOFA

that *does not* include the pre-petition property transfers to Allison.

Attorney Krall testified that he did not confer with Koch's accountant before he

filed her schedules because he was told there no documents related to Koch's businesses.

_____

[24]The Court resolve the dispute in Attorney Krall's favor.

At trial, Koch testified that she completed two pieces of paper entitled Documents Needed and Initial Client Questionnaire. However, Koch asserts that Attorney Krall did not review these documents with her–nor did he review the schedules or the SOFA–and there was nothing in the documents that would have prompted her to disclose the pre-petition property transfers.[25]  According to Koch, she did not see the schedules or the SOFA until she retained her current attorney.  In Koch's words, Attorney Krall did not explain one thing or ask her one question.

### E.     Koch's Original Bankruptcy Filing

Due to a pending foreclosure on her house and other financial problems–including a more than $2 million judgment entered against her for unpaid rent at the Partridge Creek Tin Fish–Koch filed an individual Chapter 7 bankruptcy on February 26, 2015.  Her schedules, Declaration Concerning Debtor's Schedules, and SOFA were filed on March 12, 2015.  These documents bore Koch's electronic signature under penalty of perjury.  Koch also admitted in the Answer to the Amended Complaint at paragraphs three and four that she signed the schedules and SOFA under penalty of perjury as being true and correct.[26]

---

[25]Line 46 of the Initial Client Questionnaire asks for "other transfers."

[26]Koch's current counsel indicated this was an error on his part and should not be held against his client.  Admirable, but the Court finds the admission binding upon Koch. Even if the Court found otherwise, Koch's discharge would still be denied.

Koch's original Schedule B was incorrect: it indicates that she did not have an annuity,[27] and only lists an interest in Tin Fish of Novi and Tin Fish III.[28] Koch's original Schedule F incorrectly lists a debt to Partridge Creek in the amount of $50,000.00;[29] and did not list a $350,000.00 debt Koch owed Father Paul.[30] Koch's original Schedule I indicates that the she is employed, but shows $0.00 in income. Finally, the original Schedule J shows $0.00 in expenses.

In addition, the original SOFA did not list the pre-petition transfers to Allison.

### F. 341 Meeting of Creditors

The 341 Meeting of Creditors occurred on April 2, 2015. Attorney Krall testified that, before the meeting, he told Koch what to expect and the questions that might be asked. However, Krall's son, who is also an attorney, appeared at the meeting.

Koch provided the following 341 testimony–under oath:

Q.    You've listed all of your assets and all of your liabilities; is that right?

A.    Yes.

---

[27]Koch testified at trial that she forgot about her annuity because she had not had any activity from that account in approximately 10 years; she only received one statement from Merrill Lynch regarding this annuity between 2014 and December 2015.

[28]According to Attorney Krall, he was "not aware that [Koch] was involved in other businesses."

[29]Attorney Krall testified that he was told that Partridge Creek's judgment was in the amount of $50,000.00; he did not obtain a copy of the judgment.

[30]Koch testified at trial that she did not tell Attorney Krall about the debt to Father Paul because it was "basically forgiven" by him.

Q.      Should there be any corrections or changes at all at this point in
        time?

A.      No.

(Dkt. #31-3 at p. 4).  Koch testified, at trial, that she did not know the Chapter 7 Trustee

was referring to her schedules and SOFA but did not ask for clarification.  According to

Koch, the room was very intimating; she felt like she just needed to agree.

After the 341 meeting, Attorney Krall's son informed him that Koch had an

interest in several businesses that were not listed on the SOFA.  However, Krall did not

file any amendments because:

> I was concerned I was not getting accurate information or complete
> information.  And her deposition came up or 2004 Exam came up and found
> out that there was more information I was not getting, and started asking
> Ms. Koch to start providing more information, you know, she needed to go
> to banks to get statements, go to banks and get statements, if she needed to
> go to brokers who sold real estate for her she should go to those brokers and
> get those, go to the title company or, you know, the Secretary of State get
> titles of property she transferred.
>
> I mean, I was not comfortable that I had accurate information at that point
> in time to file an amendment.

(Dep. at p. 56).[31]

---

[31]Koch testified, at trial, that Attorney Krall was supposed to contact her
accountant to get the documents he needed.

## G. *The UST's Complaint*

The UST filed a Complaint on June 30, 2015, seeking to deny Koch's discharge

under 11 U.S.C. §§ 727(a)(2)(A) and (B); 727(a)(3); and 727(a)(4)(A), (B), (C), and

(D).[32] The UST later dropped the section 727(a)(3) claim.

Specifically, the UST alleges:

1.  Within one year before the bankruptcy filing, Koch transferred property to Allison with the intent to hinder, delay, or defraud creditors and concealed the transfers by failing to report them on her SOFA.

2.  Koch intended to hinder, delay, and defraud creditors by concealing her income and personal financial condition when she used Allison's bank account and the bank accounts of numerous related entities for her individual income and expenses.

3.  Koch knowingly and fraudulently concealed the transfer of the water craft by failing to report it in the SOFA.

4.  Koch knowingly and fraudulently stated under oath at the 341 Meeting of Creditors that her schedules and SOFA were accurate.

5.  Koch intentionally omitted a $350,000.00 debt to Father Paul.

6.  Koch concealed the transfer of assets to Allison, all of her personal financial transactions in 2013 and 2014, and her unfettered access to money in Allison's personal and business bank accounts.

---

[32]Of these, the Court finds that only sections 727(a)(2)(A) and 727(a)(4)(A) are applicable.

### H.    Koch's Amended Bankruptcy Filing

Ten months after her original filings, and after retaining new counsel, Koch, at last, filed amended schedules and an amended SOFA on January 18, 2016.[33]  Schedule A/B includes her interest in all of her companies, and lists a retirement annuity.[34]  Schedule E/F includes a debt to Father Paul in the amount of $350,000.00; and lists the correct amount owed to Partridge Creek: $2,849,274.30.  Finally, Schedules I and J reflect $1,000.00 per month in income and $1,527.30 in expenses.

Koch's amended SOFA includes the pre-petition transfers of the water craft, Saturn Sky, and Jeep Grand Cherokee.

### I.    Koch's Justifications

Koch argues that she should not be denied a discharge for the following reasons:

1.    She did not transfer or conceal property within one year before the bankruptcy was filed or since the petition was filed.

2.    She did not make a false oath regarding her assets and liabilities, or conceal her assets or the transfers to Allison because she did not sign–or even review–the schedules and SOFA that were filed with the Court.

3.    She was never asked at the 341 Meeting of Creditors about the accuracy of the schedules or SOFA.

---

[33]Attorney Krall testified that he was amending the documents but did not file the amendments for two reasons: (1) Koch informed him that she was trying to find new counsel; and (2) Koch did not provide him all of the documents necessary to ensure the information was correct.

[34]The nonexempt portion of the annuity–approximately $9,000.00–was turned over to the Chapter 7 Trustee on January 27, 2016.

4.      She explained the circumstances of the transfer of the water craft when questioned about it and disclosed all of the pre-petition property transfers to Allison in the amendments to her SOFA. According to Koch, the Saturn Sky and the Jeep Grand Cherokee belonged to Allison since they were purchased; they were titled in Koch's name for insurance purposes. The water craft was transferred into Allison's name so she could sell it.

5.      There are no financial transactions between Allison's bank account and the bank accounts of other entities within one year prior to her bankruptcy filing.

6.      Her financial transactions were complex, but she did not have the intent to hinder, delay, or defraud creditors.

7.      She was ill-advised and misrepresented in the preparation and filing of the original schedules and SOFA by her first bankruptcy attorney. According to Koch, her previous counsel–who she relied on–was "nonexistent"; there was a lot she did not understand.

## IV.    CONCLUSIONS OF LAW

A bankruptcy debtor has a "paramount duty" to provide truthful and complete answers. *Johnson v. Baldridge* (*In re Baldridge*), 256 B.R. 284, 289 (Bankr. E.D. Ark. 2000). Compliance with this duty promotes the integrity of the system, and permits parties in interest to rely on the information in the schedules and SOFA without examination or investigation. *Id.* Koch's serious omissions and false statements warrant a denial of discharge; her new counsel's valiant effort to save her discharge by providing revelatory and complete amendments–ten months later–will not excuse the dishonest acts of a sophisticated businesswoman.

Further, while "reliance on counsel can show that the Debtor lacked the requisite intent required to deny [her] discharge," *Buckeye Ret. Co., LLC, LTD. v. Swegan (In re*

*Swegan)*, 383 B.R. 646, 656 (B.A.P. 6th Cir. 2008), to prevail on this theory, Koch must show: (1) full disclosure of all pertinent facts to counsel; and (2) good faith reliance on counsel's advice. *Eifler v. Wilson & Muir Bank & Trust Co.*, 588 F. App'x 473, 478-79 (6th Cir. 2014) (citing *In re Swegan*, 383 B.R. at 656). Koch–who had been a business owner for more than 30 years–failed to disclose even the most basic information to Attorney Krall–such as all of the businesses she owned. She cannot, under these circumstances, fail to disclose required information and then blame him.

### A.    *Koch's Credibility*

After hearing Koch's often conflicting answers to questions and observing her demeanor on the witness stand, the Court *does not* find her to be a credible witness. *See United States v. Crousore*, 1 F.3d 382, 386 (6th Cir. 1993) ("[c]redibility determinations are for the trial court, not for the court of appeals. Unless the district court's finding of fact is clearly erroneous, we must accept it"). For example, Koch's signature has a distinctive loop. At times, this loop appears over Allison's signature stamp, and leaves the impression that Koch's personal use of her daughter's checks was so frequent as to be indistinguishable from the use of her own checking account. But, when questioned about the loop, Koch was–at a minimum–evasive, necessitating the Court's intervention:

MS. BERG:          You see that mark over her signature?

KOCH:              Mark?

JUDGE:             What mark are you referring to?

MS. BERG:          The loop . . . over her signature.

-24-

KOCH:              Ok.

MS. BERG:          Do you recognize that marking?

KOCH:              No.

(Dkt. #61 at 36:59-37:19).

MS. BERG:          Do you see that loop over the signature line?

KOCH:              Yes I do.

MS. BERG:          You recognize that loop?

KOCH:              No.

MS. BERG:          That doesn't look like the loop that you sign your name
                   with?

KOCH:              Possibly, possibly, yes.

(Dkt. #63 at 8:58-9:10).

JUDGE:             Did you sign that Check #105?

KOCH:              Did I?

JUDGE:             Yes.

KOCH:              No.  I endorsed it.

JUDGE:             I'm talking about that signature that has that sort of familiar
                   loop in the beginning of it.

KOCH:              No.  That's Allie's signature.

JUDGE:             Pardon me.

KOCH:              That's Allie's.

JUDGE:             She has that loop as well?

-25-

| KOCH: | No. |
| JUDGE: | So where did the loop come from? |
| KOCH: | It could have been my loop. |
| JUDGE: | Why would your loop be on her signature block? |
| KOCH: | I don't know. |
| JUDGE: | Just a question. |
| KOCH: | Ok. |
| JUDGE: | Do you have an answer for that? |
| KOCH: | No sir.  I do not. |
| JUDGE: | Ok. |

(Dkt. #65 at 19:37-20:22).[35]

The Court also finds Koch's failure to comprehend her obligation to fully disclose her assets, liabilities, and relevant transfers absent specific and detailed prompting from her first attorney belied by her history of navigating complex financial disclosure requirements as a business owner.

The Court now addresses the UST's substantive arguments.

---

[35]While the vast majority of the checks at issue were negotiated more than one year prior to Koch's bankruptcy filing, the Court, alternatively, finds a continuing concealment sufficient to also extend the look-back period and deny Koch's discharge under section 727(a)(2)(A).

### B.     11 U.S.C. § 727(a)(2)(A)

The UST argues that Koch should be denied a discharge under 11 U.S.C. § 727(a)(2)(A):

> The court shall grant the debtor a discharge, unless–the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . –property of the debtor, within one year before the date of the filing of the petition.

Fraudulent intent requires actual–not constructive–fraud.  However, because debtors rarely admit fraudulent intent, it may be inferred from the circumstantial evidence. *United States Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 78-79 (Bankr. S.D. Ohio 2012).  "[A] finding of fraudulent intent is a question of fact that is highly dependent on the bankruptcy court's assessment of the debtor's credibility." *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013) (internal quotations and citation omitted).

According to the UST, the transfer and concealment of the water craft, Saturn Sky, and Jeep Grand Cherokee satisfy section 727(a)(2)(A).[36]  The Court agrees.

---

[36]Neither the Saturn Sky nor the Jeep Grand Cherokee were included in the UST's amended Complaint.  However, Fed. R. Civ. P. 15(b)(1) allows the Court to freely amend the pleadings at trial if it will aid in presenting the merits and Koch fails to prove that the evidence prejudices her defense.  The Court does not find that amending the pleadings would prejudice Koch: the transfer of the Saturn Sky and the Jeep Grand Cherokee were mentioned in the UST's response to Koch's motion for summary judgment that was filed on August 5, 2016; and Koch addressed the transfers on August 18, 2016.

First, Attorney Krall specifically asked Koch if she transferred property within the last two years, gave her written instructions not to transfer property and warned her that doing so could result in the denial of her discharge, and the Initial Client Questionnaire contained a space to include "other transfers."  Being a sophisticated businesswoman, Koch did not inadvertently fail to disclose the transfers to Attorney Krall: she knew, or should have known, to at least mention to Attorney Krall that the titles to the vehicles and water craft were placed in Allison's name within one year before the bankruptcy filing. *See Brock v. Weeden (In re Weeden)*, 306 B.R. 449, 459 (Bankr. W.D.N.Y. 2004) ("As an intelligent, educated and financially sophisticated individual, the Debtor could not honestly or inadvertently have failed to disclose the sale . . . in Question 10 of her [SOFA]."); *Crocker v. Cooper (In re Cooper)*, No. 315-90523 (Bankr. M.D. Tenn. December 8, 2016) ("The debtors offered excuses for failing to disclose all of their property, but the Court finds that their explanations are not plausible given the debtors' education and experience.").  Indeed, Koch transferred title to the water craft and Jeep Grand Cherokee to Allison just 16 days before her bankruptcy filing.  Given the timing and failure to disclose, anything less than an improper motive strains credulity.

Second, Koch is correct that she disclosed the transfers on her amended SOFA. However, "[g]enerally, a debtor's amendment of [her] schedules and/or reporting of omissions or misstatements *prior to or at the meeting of creditors* evidences a lack of fraudulent intent." *Buckeye Ret. Co., LLC v. Heil (In re Heil)*, 289 B.R. 897, 908 (Bankr. E.D. Tenn. 2003) (emphasis added).  Koch's 341 Meeting of Creditors occurred on April

2, 2015; she did not mention the transfers at that time.  Instead, knowing that: (1)

Allison's name was placed on the titles to the vehicles and water craft within one year

before filing bankruptcy; (2) she had not mentioned this information to Attorney Krall;

and (3) Attorney Krall filed her bankruptcy petition on February 26, 2015, Koch allowed

the documents to remain part of the Court file for approximately 10 months until the

transfers were finally disclosed on January 18, 2016.  Koch had ample time to ask

Attorney Krall to review what he filed so she could confirm the accuracy of the

documents.

Finally, Koch argues that the vehicles and water craft were not *transferred* to

Allison within one year before the bankruptcy filing: they were always her property; the

names on the titles were simply changed within one year before the bankruptcy filing.

She relies on a case that held: "the certificate of title was not conclusive evidence on the

issue of ownership of the automobile, and the court was not in error in . . . deciding the

issue of ownership upon the evidence." *Wood v. Merchants Ins. Co. of Providence*, 289

N.W. 259, 260 (Mich. 1939).  However, there is a statutory presumption that Koch, as the

person shown on the certificate of title, is the owner of the vehicles and water craft. *See*

MICH. COMP. LAWS § 257.37(b) (defining "owner" as "a person who holds the legal title

of a vehicle); *Guijosa v. Kaylor*, No. 218534, 2000 WL 33394520, at *2 (Mich. Ct. App.

Dec. 19, 2000) ("the presence of defendant's name on the certificate of title for the

vehicle at the time of the accident created a presumption that defendant was an owner of

the vehicle").  Koch's uncorroborated testimony that she purchased the vehicles for

Allison is insufficient to overcome this presumption. In fact, Koch testified that she paid for the vehicles and drove them on occasion.[37] And there is no evidence that there was an express trust making Allison a beneficial owner. *See Scarney v. Clarke*, 275 N.W. 765, 767 (Mich. 1937) ("To constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created.").

### C.       11 U.S.C. § 727(a)(4)(A)

The UST next argues that Koch should be denied a discharge under 11 U.S.C. § 727(a)(4)(A) because she "knowingly and fraudulently, in or in connection with the case[] made a false oath or account[.]" To deny Koch's discharge under this section, the UST must demonstrate that:

> (1) Koch made a statement under oath; (2) the statement was false; (3) Koch knew the statement was false; (4) Koch made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000). However, if the false information is the result of mistake or inadvertence, Koch remains entitled to a discharge. *McDermott v. Schwartz (In re Schwartz)*, 527 B.R. 266, 275 (Bankr. E.D. Mich. 2015) (quoting *In re Keeney*, 227 F.3d at 685-86).

---

[37]Presumably, Koch's name was on the insurance considering the fact that the vehicles were titled in Koch's name for "insurance purposes."

Statements made at Koch's 341 Meeting of Creditors constitute statements under oath. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)).

Koch essentially argues that she should not be held responsible for the answers provided at the meeting because the questions were ambiguous, she was not asked to confirm the accuracy of her schedules and SOFA, the room was intimating, Attorney Krall was not present, and she did not understand the questions. These arguments lack merit. Again, Koch is a sophisticated businesswoman who could have easily asked for clarification from either the Chapter 7 Trustee or Attorney Krall's son who was present. Instead, when asked if she has "listed all of [her] assets and all of [her] liabilities," she responded affirmatively; when asked if "there [were] any corrections or changes," she responded negatively. At minimal, Koch knew she had not informed Attorney Krall or included a $350,000.00 debt to Father Paul in her bankruptcy. *See* Dkt. #31-4 at p. 46:

> Q.   Okay. Now, I don't see him [Father Paul] listed in your bankruptcy schedules, why is that?
>
> A.   I, I just, I can't do that to him. He knows, he knows the situation and I'll do what I can.

An intentional omission of a creditor is sufficient to satisfy section 727(a)(4). *See Sawyer v. Budrow (In re Budrow)*, 194 B.R. 172, 175 (Bankr. W.D. Tenn. 1996):

> The facts of this case establish that these debtors knowingly omitted creditors; thus, their petition was wilfully incomplete and they made false oaths when they signed their petition as being "true and correct." Under 11 U.S.C. § 727(a)(4)(A), this would be sufficient grounds to deny the debtors' discharge in this particular case.

## V.     CONCLUSION

The UST has met its burden and established by a preponderance of the evidence

that Koch is not entitled to a discharge.  Accordingly, the Court will enter a judgment in

favor of the UST, denying Koch a discharge pursuant to sections 727(a)(2)(A) and

727(a)(4)(A) of the bankruptcy code.

**IT IS ORDERED**.

**Signed on January 13, 2017**                              /s/ Mark A. Randon_____
                                                                         **Mark A. Randon**
                                                                         **United States Bankruptcy Judge**